**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

|  |  |
|---|---|
| Christopher DiPasquale, | |
| *Plaintiff,* | Case No. 1:26-cv-00130 |
| v. | |
| @JamesBullzs, the Bybit Off-Ramp Defendant, the Binance Off-Ramp Defendant, and John Does 1 – 20, | **Complaint** |
| *Defendants.* | |

Plaintiff Christopher DiPasquale hereby sues @JamesBullzs, the Bybit Off-Ramp Defendant, the Binance Off-Ramp Defendant, and John Does 1 – 20 (collectively, the "Defendants"). In support, he alleges as follows.

### I.    Preliminary Statement

1.    Our country is in the midst of a crypto-fraud crisis. Criminal actors routinely exploit confusion, urgency, and the anonymity of online platforms to steal digital assets from ordinary Americans. One recurring pattern involves the impersonation of wallet providers or technical-support personnel during moments of account disruption, then the use of fraudulent recovery tools to obtain seed phrases or other credentials. These schemes are not isolated incidents or amateur swindles. They are deliberate,

technologically enabled fraud operations that rely on social engineering, sophisticated online infrastructure, and extensive money-laundering networks to extract enormous sums from victims while evading detection and recovery.

2.     Tens of thousands of Americans have lost substantial assets to cryptocurrency fraud. According to the Federal Bureau of Investigation's Internet Crime Complaint Center ("IC3"), American victims reported approximately **$9.3 billion** in losses from cryptocurrency investment fraud in 2024, a figure that reflects only reported complaints and is widely believed to understate actual harm. Globally, blockchain analytics firm Chainalysis estimates that crypto-related scams and fraud extracted between $14 billion and $17 billion from victims in 2025, the highest annual figure on record and a continuing upward trend driven by increasingly sophisticated social-engineering and AI-enabled tactics. These figures underscore the scale, organization, and escalating financial impact of cryptocurrency fraud, including support-impersonation and wallet-compromise schemes, on U.S. consumers.

3.     This action arises from a cryptocurrency wallet compromise scheme that exploited a widely reported TrustWallet glitch. While the glitch made it appear that Mr. DiPasquale's assets had disappeared, the Defendants impersonated TrustWallet support personnel and directed Mr. DiPasquale to a fraudulent recovery form for the ostensible purpose of

restoring his wallet. After obtaining his seed phrase through that deception, the Defendants stole $417,306 of Mr. DiPasquale's digital assets and rapidly moved them through the blockchain to off-ramp exchange accounts.

4.     This action and coordination with law enforcement are Mr. DiPasquale's only hopes for recovery. This suit seeks the return of the assets stolen by the Defendants and additional relief described below.

## II.    Parties

5.     Plaintiff Christopher DiPasquale is a United States citzen residing in Boston, MA.

6.     Defendant @JamesBullzs is an individual claiming to be a TrustWallet support representative. His present whereabouts and citizenship are unknown.

7.     The Bybit Off-Ramp Defendant is a recipient of the assets misappropriated from the victim in this case. The Bybit Off-Ramp Defendant is a foreign individual or entity whose present whereabouts and citizenship are unknown.

8.     The Binance Off-Ramp Defendant is a recipient of the assets misappropriated from the victim in this case. The Binance Off-Ramp Defendant is a foreign individual or entity whose present whereabouts and citizenship are unknown.

9.     Defendants John Does 1 – 20 are as-yet unidentified co-conspirators whose present whereabouts and citizenship are unknown. These

defendants helped @JamesBullzs and the Off-Ramp Defendants perpetrate the scheme that deprived Mr. DiPasquale of his digital assets.

### III.   Jurisdiction & Venue

10.    This is an action under the Racketeer Influenced and Corrupt Organizations Act ("RICO").   Accordingly, this Court has federal-question jurisdiction.

11.    This Court has personal jurisdiction over Defendants pursuant to RICO and consistent with the Due Process Clause of the Fifth Amendment. RICO authorizes nationwide service of process, and where, as here, a federal statute provides for such service, the relevant constitutional inquiry is whether Defendants have sufficient aggregate contacts with the United States as a whole, not with any single state.

12.    The Defendants purposefully directed their conduct at the United States by targeting U.S. residents, inducing the transfer of funds from U.S.-based accounts, utilizing U.S.-based cryptocurrency infrastructure and internet services, and causing substantial harm within the United States. Exercising personal jurisdiction over Defendants therefore comports with traditional notions of fair play and substantial justice, and is reasonable under the Supreme Court's flexible due-process framework applicable to federal statutes providing for nationwide service of process.

13.    In the alternative, this Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2). This action arises under federal law, Defendants are not subject to the personal

jurisdiction of any single state's courts, and Defendants have sufficient contacts with the United States as a whole to satisfy due process. Accordingly, the exercise of jurisdiction under Rule 4(k)(2) is proper.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(c)(3), which provides that a foreign defendant may be sued in any judicial district.

### IV.     Background

15.     Technical-support-impersonation and cryptocurrency wallet recovery scams are a recognized and increasingly common form of online fraud. This section describes the defining characteristics of these schemes, including their use of platform disruptions, false support identities, credential-harvesting interfaces, and cryptocurrency infrastructure, as established by law-enforcement agencies, regulators, and industry reporting.

### A.     Support-Impersonation and Wallet-Recovery Scams

16.     A common form of cryptocurrency fraud involves perpetrators posing as customer-support representatives, wallet-security personnel, or recovery specialists in order to obtain seed phrases, private keys, or other account credentials from victims. These schemes frequently arise when victims experience a real or perceived account problem—such as a login issue, apparent asset disappearance, or wallet-display malfunction—and then search online for assistance. The fraud turns on impersonation and credential theft, not on any legitimate recovery process.

17. Unlike a traditional investment scam, a support-impersonation wallet-compromise scheme does not depend on prolonged grooming or fictitious profits. Instead, perpetrators exploit urgency and confusion created by an apparent technical problem. They initiate or intercept contact through social-media platforms, messaging applications, search results, or fraudulent websites, and then present themselves as trustworthy support personnel. Once trust is established, even briefly, the perpetrators direct the victim to a purported recovery portal or troubleshooting tool and induce the victim to disclose wallet credentials under the false pretense that doing so is necessary to restore access or visibility.

18. The FBI, through its Internet Crime Complaint Center ("IC3"), has warned that cryptocurrency-related fraud frequently involves impersonation, social engineering, and the theft of wallet credentials through deceptive online communications. Consumer protection guidance issued across the cryptocurrency industry likewise recognizes that recovery scams often target users during moments of technical confusion and falsely present credential disclosure as a routine support step.

19. Researchers, investigators, and industry analysts have also documented the repeatable structure of wallet-recovery frauds. The core pattern is consistent: a triggering event creates alarm, a fraudster adopts a false support identity, a convincing interface is used to harvest credentials, and the victim's assets are then drained and rapidly moved through

blockchain infrastructure. Although the surrounding facts may vary from case to case, the underlying method is standardized and scalable across victims, platforms, and jurisdictions.

20.    As described in these sources, support-impersonation wallet-compromise scams are best understood as a system of fraud rather than a series of isolated incidents. Their defining feature is the conversion of a victim's legitimate search for technical assistance into a credential-theft event. Once the fraudster acquires the wallet seed phrase or equivalent credentials, the victim's assets can be misappropriated immediately and irreversibly, often before the victim understands that the supposed recovery process was itself the scam.

**B.    Reliance on Cryptocurrency and Online Support Infrastructure**

21.    Support-impersonation wallet-compromise scams rely heavily on cryptocurrency and internet-based infrastructure to facilitate both the execution and concealment of fraudulent activity. Cryptocurrency enables perpetrators to receive and move large sums of value rapidly, across borders, and with a degree of pseudonymity that is difficult for individual victims to penetrate without legal process. Online platforms likewise allow perpetrators to impersonate trusted support channels at low cost and with broad reach.

22.    In a typical wallet-recovery scam, the victim is not persuaded to invest in a fictitious platform. Instead, the victim is induced to provide credentials or to sign transactions under the false belief that doing so will

restore access to an existing wallet. The fraudulent websites, forms, or portals used in the scheme are presented as legitimate support tools even though they are controlled entirely by the fraud enterprise. Their purpose is to obtain the information needed to seize control of the victim's assets.

23.     Once wallet credentials are compromised, perpetrators commonly route stolen assets through centralized cryptocurrency exchanges, custodial services, or other third-party infrastructure providers. These intermediaries play a functional role in the fraud ecosystem by enabling the aggregation, storage, conversion, and onward transfer of misappropriated assets. The use of such services allows perpetrators to consolidate funds from multiple victims and to move assets through successive layers of accounts.

24.     The design of these schemes prioritizes speed and dissipation. Once credentials are obtained and assets are moved, perpetrators often transfer the cryptocurrency quickly through multiple wallets or accounts in an effort to frustrate tracing and recovery. This rapid movement increases the risk that stolen assets will be irretrievably lost unless prompt investigative and legal measures are taken.

25.     Because support-impersonation wallet-compromise scams depend on identifiable cryptocurrency transactions and the use of centralized infrastructure at key stages, blockchain analysis and legal process directed to service providers are critical tools for identifying the flow of stolen assets and preserving them for potential recovery. Courts are therefore routinely

called upon to evaluate requests for asset preservation and expedited discovery in cases involving this form of fraud.

## V.    Application of Fraud Framework to Victim's Experience

26.    The events giving rise to this action reflect the same sequence of conduct, methods, and structural features that characterize support-impersonation wallet-compromise schemes as described above. The following factual allegations illustrate how those features manifested in the victim's experience.

### A.    Initial Contact with Purported Support Agent

27.    On October 12, 2025, Mr. DiPasquale experienced a technical anomaly while using TrustWallet affecting thousands of other users, in which his digital asset balances appeared to be empty. Seeking information and assistance regarding this issue, he began investigating possible explanations online. While searching on Twitter, Mr. DiPasquale discovered an individual using the handle @JamesBullzs, who was publicly interacting with other Twitter users and presenting himself as a technical support officer for TrustWallet. This user had a visible history of engaging in discussions about TrustWallet-related topics and claimed in multiple posts to have aided other users in recovering access to their digital assets. Several other Twitter users responded to @JamesBullzs, purporting to have received successful assistance from him. Relying on these assurances and the surrounding confusion caused by the TrustWallet zero-balance glitch, Mr. DiPasquale

initiated direct contact with @JamesBullzs via Twitter to seek help with the apparent disappearance of the wallet assets.

### B. Fraudulent Recovery Portal and Seed-Phrase Harvesting

28. In response to Mr. DiPasquale's inquiry, @JamesBullzs directed him to an online form that he represented as an official TrustWallet recovery portal. The form was designed to resemble a legitimate technical-support interface and instructed Mr. DiPasquale to provide technical details to facilitate restoration of the wallet balance display. At the direction of @JamesBullzs, Mr. DiPasquale completed the form and submitted information requested there, including the 12-word seed phrase associated with his TrustWallet account. @JamesBullzs assured him that this step was safe, necessary, and required to restore visibility and access to the wallet's contents. In truth, the form was a fraudulent credential-harvesting interface controlled by the scammer, and it provided no warning that disclosure of a seed phrase would permit immediate takeover of the wallet.

### C. Unauthorized Transfers Following Credential Compromise

29. After Mr. DiPasquale submitted the 12-word seed phrase into the online form, the scam was rapidly executed. Using Mr. DiPasquale's wallet credentials, the scammer promptly accessed his TrustWallet account and initiated unauthorized transfers of all digital assets contained in the wallet. Mr. DiPasquale's entire digital portfolio, valued at $417,306, was removed from his control in a single episode following the online interaction.

These transfers were executed without Mr. DiPasquale's knowledge or consent, and the assets were moved to blockchain addresses not controlled by him.

### D.  Discovery of Theft and Failed Recovery Efforts

30.    Following the unauthorized transfer of assets from his TrustWallet account, Mr. DiPasquale immediately recognized that the apparent zero balance was not the result of any legitimate recovery process. All efforts to retrieve the stolen assets proved futile, and Mr. DiPasquale then realized that the TrustWallet glitch had been exploited as the opening for a support-impersonation fraud that resulted in the theft of the wallet's contents.

### E.  Representative Misrepresentations Made to Plaintiff

31.    @JamesBullzs made several categories of false representations to Mr. DiPasquale. First, regarding identity and credentials, @JamesBullzs claimed to be a technical support officer at TrustWallet, a representation belied by the lack of any genuine affiliation with the company. Second, with respect to platform legitimacy, the purported recovery portal was presented as an official tool operated by TrustWallet, when in truth it was a fraudulent interface controlled by the scammer. Third, @JamesBullzs misrepresented the expected outcome that submitting the 12-word seed phrase would restore account balances, falsely assuring Mr. DiPasquale that the process was safe and necessary. Finally, the scammer deceived Mr. DiPasquale by omitting

any disclosure regarding the irreversible consequences of disclosing a wallet seed phrase, masking the true nature and risks associated with the tool and the process.

## VI.  Tracing & Movement of Misappropriated Assets

32.   This section describes the movement of Mr. DiPasquale's misappropriated cryptocurrency assets from the initial transfers induced by the fraud through subsequent transactions on the blockchain, including transfers through wallets and centralized cryptocurrency services associated with the Defendants.

### A.  Transfers of Cryptocurrency from Plaintiff

33.   In reliance on the misrepresentations described above, Mr. DiPasquale provided his recovery phrase and other compromising information about his TrustWallet to the scammers, who then transferred his assets from his TrustWallet without his consent.

### B.  Blockchain Tracing of the Stolen Assets

34.   Blockchain analysis performed after discovery of the fraud identified the movement of Mr. DiPasquale's cryptocurrency from the initial destination wallets through a series of subsequent transactions. Because cryptocurrency transactions are recorded on public blockchains, the flow of funds could be traced despite the perpetrators' use of pseudonymous wallet addresses.

35.   Blockchain analysis revealed that, immediately following submission of Mr. DiPasquale's 12-word seed phrase, all digital assets

belonging to him were transferred to addresses beyond his control. On-chain tracing established that the majority of the stolen funds was moved through a series of intermediary blockchain addresses. Ultimately, the assets were deposited into accounts at major cryptocurrency exchanges, specifically Bybit and Binance. The transfer patterns and consolidation of assets demonstrate a direct connection between the loss suffered by Mr. DiPasquale and the movement of funds to the benefit of unidentified defendants operating the fraudulent scheme.

### C.      Transfers through Centralized Exchanges & Custodial Services

36.     Tracing analysis revealed that a substantial portion of Mr. DiPasquale's cryptocurrency was transferred from intermediary wallets to accounts held at centralized cryptocurrency exchanges and custodial service providers. These services enable the storage, conversion, and withdrawal of cryptocurrency and serve as critical exit points for fraud proceeds.

37.     The transfers into these services were identifiable through on-chain transaction data and corresponded to known deposit addresses associated with specific platforms. Once deposited, the assets were commingled with other funds and became subject to the internal account controls of the custodial providers.

38.     The use of centralized exchanges and custodial services allowed the Defendants to convert, transfer, or withdraw stolen assets in a manner

that would be difficult or impossible for individual victims to prevent without timely judicial intervention.

### D.    Dissipation Risk and Need for Prompt Asset Preservation

39.    The tracing analysis showed that the stolen assets were moved rapidly after receipt and continued to be transferred through multiple wallets and platforms. This pattern reflects a deliberate effort by the Defendants to dissipate and conceal the proceeds of fraud and substantially increases the risk that the assets will be irretrievably lost.

40.    Because cryptocurrency transactions are irreversible and because custodial platforms may permit rapid withdrawal or conversion absent legal restraint, delays in investigation or court-ordered relief materially reduce the likelihood of recovery.

41.    Courts addressing pig-butchering and similar cryptocurrency fraud schemes have recognized that early asset tracing, preservation orders, and expedited discovery are essential to prevent irreparable harm to victims and to preserve the possibility of restitution.

### E.    Connection Between Traced Assets and Defendants

42.    The wallets, accounts, and infrastructure through which Mr. DiPasquale's assets were transferred are associated with the Defendants and/or entities that provided services integral to the operation of the fraud scheme. These services enabled the receipt, aggregation, storage, and movement of stolen assets and were necessary to the scheme's success.

43.     The tracing evidence establishes a direct causal link between the Defendants' fraudulent conduct, Mr. DiPasquale's cryptocurrency transfers, and the subsequent movement of those assets through identifiable wallets and service providers. This chain of transactions confirms that Mr. DiPasquale's losses were the foreseeable and intended result of the scheme.

## VII.    Defendants' Roles & Participation in the Fraudulent Scheme

44.     The fraudulent scheme described above depended on the coordinated participation of multiple Defendants, each of whom performed a distinct and essential role. As alleged herein, each Defendant knowingly engaged in conduct that furthered the scheme and was necessary to its success.

### A.    @JamesBullzs — The Groomer and Social-Engineering Operator

45.     @JamesBullzs acted as the primary groomer and social-engineering operator in the scheme. @JamesBullzs initiated contact with Mr. DiPasquale and made the misrepresentations that induced Mr. DiPasquale to provide his TrustWallet credentials.

46.     Using a fabricated identity and false personal background, @JamesBullzs cultivated trust through representations of technical expertise and association with TrustWallet.

47.     @JamesBullzs directed Mr. DiPasquale to use the fraudulent asset-recovery form and further conveyed false assurances regarding Mr. DiPasquale's ability to access his funds.

### B. The Bybit and Binance Off-Ramp Defendants — Money Laundering and Exchange Off-Ramp Account(s)

48. The Bybit Off-Ramp Defendant agreed to participate in the conspiracy by agreeing with the other members of the Enterprise that they would route Mr. DiPasquale's assets through multiple addresses on the blockchain and ultimately pool them at off-ramp exchange accounts controlled by the Bybit Off-Ramp Defendant. This conduct was undertaken for the purpose of facilitating the laundering and concealment of Mr. DiPasquale's stolen cryptocurrency. Blockchain tracing analysis determined that approximately $328,200 of Mr. DiPasquale's assets were transferred to accounts controlled by the Bybit Off-Ramp Defendant. By knowingly receiving, holding, converting, and transferring these fraud proceeds, the Bybit directly facilitated the monetization and dissipation of Mr. DiPasquale's losses.

49. The Binance Off-Ramp Defendant agreed to participate in the conspiracy by agreeing with the other members of the Enterprise that they would route Mr. DiPasquale's assets through multiple addresses on the blockchain and ultimately pool them at off-ramp exchange accounts controlled by the Binance Off-Ramp Defendant. This conduct was undertaken for the purpose of facilitating the laundering and concealment of Mr. DiPasquale's stolen cryptocurrency. Blockchain tracing analysis determined that approximately $11,000 of Mr. DiPasquale's assets were transferred to accounts controlled by the Binance Off-Ramp Defendant. By knowingly

receiving, holding, converting, and transferring these fraud proceeds, the Binance Off-Ramp Defendant directly facilitated the monetization and dissipation of Mr. DiPasquale's losses.

### C.      Coordinated and Interdependent Conduct

50.      The Defendants' conduct was coordinated and interdependent. Each Defendant performed a specialized function that complemented the others and advanced the common objective of defrauding Mr. DiPasquale.

51.      @JamesBullz induced Mr. DiPasquale to provide his wallet credentials and the Bybit and the Binance Off-Ramp Defendants (collectively, the "Off-Ramp Defendants") converted and off-ramped the stolen assets and controlled the fraud proceeds.

52.      These actions reflect a deliberate division of labor consistent with organized cryptocurrency fraud schemes and demonstrate knowing participation in a common plan that directly caused Mr. DiPasquale's losses. Defendants did not merely receive cryptocurrency incidentally or passively. Each Defendant knowingly agreed to perform a specific function within the scheme and undertook affirmative acts in furtherance of that role. These acts included placing accounts or wallet infrastructure at the disposal of the scheme, exercising discretion over the receipt and movement of funds, and repeatedly performing the same functions as part of an ongoing operation.

## VIII.  Evidence of Multiple Victims and Ongoing Fraudulent Activity

53.     The fraudulent conduct described above was not limited to Mr. DiPasquale or to a single, isolated incident. Blockchain tracing and analysis of transactions associated with Defendants' wallet addresses and exchange accounts reveal that Defendants received cryptocurrency from numerous additional sources consistent with victim transfers in similar fraud schemes.

54.     Backward tracing of transactions flowing into wallet addresses and exchange accounts controlled by the Defendants shows repeated deposits originating from multiple U.S.-based cryptocurrency exchanges and other sources associated with individual retail accounts, rather than a single origin or legitimate business activity.

55.     These incoming transactions occurred over an extended period exceeding one year, with substantial amounts transferred at regular intervals. The volume, timing, and structure of these transactions are inconsistent with ordinary investment activity and are consistent with the aggregation of proceeds from multiple fraud victims.

56.     The traced transactions include deposits traceable to accounts at U.S.-based exchanges commonly used by individual consumers, indicating that the scheme affected multiple victims located in the United States, not solely Mr. DiPasquale in this action.

57.     The repeated receipt of funds from different sources, across different exchanges, and over a prolonged period demonstrates that

Defendants' conduct was part of a continuing course of fraudulent activity, rather than a single completed act. The same wallet addresses, exchange accounts, and laundering pathways were reused to process victim funds.

58.   Moreover, tracing shows that Defendants' infrastructure remained active after Mr. DiPasquale's losses were incurred, and continued to receive and move cryptocurrency in a manner consistent with ongoing fraudulent activity. This pattern indicates a threat of continued criminal conduct absent judicial intervention.

59.   The existence of multiple victims, repeated transactions, and the reuse of the same laundering and pooling mechanisms confirms that Defendants' scheme was designed to operate indefinitely and to extract cryptocurrency from additional victims over time.

## IX.   Causes of Action

60.   Mr. DiPasquale brings the following causes of action against the Defendants. The allegations set out above are incorporated into each of the causes of action that follow as if fully restated therein.

**COUNT ONE**
**RACKETEERING IN VIOLATION OF 18 U.S.C. § 1964(C)**
**AGAINST ALL DEFENDANTS**

61.   Mr. DiPasquale realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

## A.    The RICO Enterprise

62.    At all relevant times, Defendant @JamesBullzs and the Off-Ramp Defendants were associated with an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise").

63.    The Enterprise consisted of a group of individuals and entities associated in fact for the common purpose of defrauding victims through pig-butchering cryptocurrency investment schemes, extracting cryptocurrency from victims, laundering the proceeds, and consolidating and enjoying the fraud proceeds.

64.    The Enterprise had relationships, longevity, and structure sufficient to permit its members to pursue the Enterprise's purpose. Defendants performed distinct but complementary roles pursuant to an agreed-upon division of labor, including grooming victims, operating a fraudulent trading platform, laundering proceeds through exchange off-ramps, and consolidating assets in pooling addresses.

## B.    Interstate Commerce

65.    At all relevant times, the activities of the Enterprise affected interstate and foreign commerce, including through the use of interstate wire communications, internet-based messaging platforms, cryptocurrency networks, and centralized cryptocurrency exchanges operating in or affecting the United States.

### C.     Conduct or Participation in the Enterprise's Affairs

66.     Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

67.     Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

68.     @JamesBullzs conducted the Enterprise's affairs by initiating and maintaining communications with Mr. DiPasquale, making fraudulent misrepresentations, cultivating trust through fabricated identities, and inducing him to provide his TrustWallet credentials pursuant to the Enterprise's scheme.

69.     The Off-Ramp Defendants conducted the Enterprise's affairs by knowingly and affirmatively agreeing to serve as a laundering and off-ramp conduit for fraud proceeds. The Off-Ramp Defendants agreed with other members of the Enterprise to receive stolen cryptocurrency into centralized exchange accounts and to convert, withdraw, and transfer those assets in furtherance of the scheme.

70.     The Off-Ramp Defendants roles were not passive or incidental. By agreeing to place exchange accounts at the disposal of the Enterprise, knowingly receiving large volumes of fraud proceeds, and executing conversions and withdrawals consistent with laundering activity, the Off-Ramp Defendants exercised discretion, judgment, and control that furthered

the Enterprise's objectives and enabled the laundering and monetization of stolen assets.

### D.   Pattern of Racketeering Activity

71.   Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple acts of wire fraud in violation of 18 U.S.C. § 1343.

72.   These predicate acts included, without limitation, the transmission of fraudulent representations via interstate wire communications, the use of interstate wires to direct victims to transfer cryptocurrency, the operation of a fraudulent trading platform through internet-based systems, and the use of interstate wires to move, convert, launder, and consolidate fraud proceeds.

73.   The racketeering acts were related, as they shared common purposes, victims, methods, and participants, and they amounted to or posed a threat of continued criminal activity.

74.   The racketeering acts constituted closed-ended continuity, as they occurred over a substantial period of time, and open-ended continuity, as the scheme was inherently capable of repetition and posed a continuing threat to additional victims.

### E.   Proximate Cause and Damages

75.   Defendants' violations of 18 U.S.C. § 1962(c) were the direct and proximate cause of Mr. DiPasquale's injuries, including the loss of

cryptocurrency assets transferred in reliance on Defendants' fraudulent conduct.

76.    As a result of Defendants' RICO violations, Mr. DiPasquale suffered concrete financial losses, including but not limited to the value of misappropriated cryptocurrency, lost investment capital, and related damages.

### F.    Vicarious and Joint Liability

77.    Each Defendant is jointly and severally liable for the acts of the other Defendants committed in furtherance of the Enterprise's affairs.

78.    Defendants are also liable under principles of vicarious liability, aiding and abetting, and respondeat superior, as applicable.

### G.    Statute of Limitations Tolling

79.    Defendants concealed the existence of the Enterprise and the fraudulent nature of their conduct through fabricated platforms, false identities, and deliberate obfuscation of asset flows, thereby tolling the statute of limitations under principles of fraudulent concealment.

### H.    Relief

80.    Mr. DiPasquale seeks all relief available under 18 U.S.C. § 1964, including treble damages, costs, attorneys' fees, and appropriate equitable relief.

## COUNT TWO
### RACKETEERING CONSPIRACY - 18 U.S.C. § 1964(D)
### AGAINST ALL DEFENDANTS

81.   Mr. DiPasquale realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

82.   Defendant @JamesBullzs and the Off-Ramp Defendants knowingly agreed and conspired to conduct and participate, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

83.   Each Defendant knowingly agreed that a member of the conspiracy would commit at least two acts of racketeering activity constituting wire fraud, money laundering, or related offenses, and each Defendant agreed to perform a specific role in furtherance of the Enterprise's unlawful objectives.

84.   The conspiracy was formed for the common purpose of defrauding victims through pig-butchering cryptocurrency investment schemes, extracting cryptocurrency from victims through fraudulent means, laundering and off-ramping the proceeds, and consolidating and enjoying the fraud proceeds.

85.   In furtherance of the conspiracy, @JamesBullzs agreed to initiate and maintain deceptive communications with victims, to make material misrepresentations, and to induce victims to divulge cryptocurrency wallet credentials pursuant to the scheme.

86. In furtherance of the conspiracy, the Off-Ramp Defendants agreed to provide exchange accounts under their control for the purpose of receiving, converting, withdrawing, and transferring the proceeds of fraud, with knowledge that such accounts would be used to launder cryptocurrency derived from victim losses.

87. Each Defendant knew the essential nature of the plan and knowingly agreed to facilitate the scheme by performing acts that were necessary or advantageous to the Enterprise's success, even if each Defendant did not personally commit every racketeering act.

88. The conspiracy contemplated and resulted in the commission of multiple overt acts, including the use of interstate wire communications, the operation of fraudulent online infrastructure, the transfer of cryptocurrency through blockchain networks, and the laundering and consolidation of fraud proceeds.

89. Mr. DiPasquale was injured in his business or property by reason of the Defendants' agreement to conduct and participate in the Enterprise's affairs through a pattern of racketeering activity, entitling him to relief under 18 U.S.C. § 1964.

### COUNT THREE
### CONVERSION – COMMON LAW
### AGAINST ALL DEFENDANTS

90. Mr. DiPasquale realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

91.    At all relevant times, @JamesBullzs and the Off-Ramp Defendants knowingly participated in a common plan and scheme to defraud Mr. DiPasquale through a cryptocurrency scam.

92.    In furtherance of the scheme, @JamesBullzs made material misrepresentations and omissions to Mr. DiPasquale, including false statements regarding his identity, experience, and intentions.

93.    These misrepresentations were false when made and were known to be false by @JamesBullzs at the time they were made. They were communicated with the intent to induce Mr. DiPasquale to rely on them and to transfer cryptocurrency pursuant to the scheme.

94.    The Off-Ramp Defendants knowingly participated in and furthered the fraud by agreeing to receive, convert, withdraw, and transfer cryptocurrency derived from the scheme through centralized exchange accounts under their control. They knew that the assets received through these accounts were the proceeds of fraud and that the accounts were being used to launder victim funds.

95.    Each Defendant knew of the fraudulent plan and agreed to facilitate it, and each Defendant committed acts in furtherance of the fraud. Accordingly, Defendants are liable for fraud under theories of direct liability, conspiracy to defraud, and aiding and abetting fraud.

96. Mr. DiPasquale reasonably and justifiably relied on the misrepresentations and omissions described above in providing his TrustWallet credentials.

97. As a direct and proximate result of Defendants' fraudulent conduct, Mr. DiPasquale suffered substantial damages, including the loss of cryptocurrency assets and related financial harm.

### COUNT FOUR
### FRAUD – COMMON LAW
### AGAINST ALL DEFENDANTS

98. Mr. DiPasquale realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

99. At all relevant times, @JamesBullzs and the Off-Ramp Defendants knowingly participated in a common plan and scheme to defraud Mr. DiPasquale through a pig-butchering cryptocurrency investment scam.

100. In furtherance of the scheme, @JamesBullzs made material misrepresentations and omissions to Mr. DiPasquale, including false statements regarding John Doe's identity, experience, and intentions.

101. These misrepresentations were false when made and were known to be false by @JamesBullzs at the time they were made. They were communicated with the intent to induce Mr. DiPasquale to rely on them and to provide his wallet credentials pursuant to the scheme.

102. The Off-Ramp Defendants knowingly participated in and furthered the fraud by agreeing to receive, convert, withdraw, and transfer

cryptocurrency derived from the scheme through centralized exchange accounts under their control. The Off-Ramp Defendants knew that the assets received through these accounts were the proceeds of fraud and that the accounts were being used to launder victim funds.

103. Each Defendant knew of the fraudulent plan and agreed to facilitate it, and each Defendant committed acts in furtherance of the fraud. Accordingly, Defendants are liable for fraud under theories of direct liability, conspiracy to defraud, and aiding and abetting fraud.

104. Mr. DiPasquale reasonably and justifiably relied on the misrepresentations and omissions described above in transferring cryptocurrency and in making additional transfers in response to Defendants' demands.

105. As a direct and proximate result of Defendants' fraudulent conduct, Mr. DiPasquale suffered substantial damages, including the loss of cryptocurrency assets and related financial harm.

## COUNT FIVE
### UNJUST ENRICHMENT/RESTITUTION – COMMON LAW
### AGAINST ALL DEFENDANTS

106. Mr. DiPasquale realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

107. Defendant @JamesBullzs and the Off-Ramp Defendants each received benefits at the expense of Mr. DiPasquale, including cryptocurrency

assets and proceeds thereof that were misappropriated through fraud and deception.

108.   Defendants knowingly accepted, retained, used, or controlled these benefits, either directly or indirectly, as part of the coordinated scheme described herein.

109.   Defendants' receipt and retention of Mr. DiPasquale's cryptocurrency was unjust and inequitable because the assets were obtained through wrongful conduct, without lawful consideration, and in violation of his rights.

110.   Equity and good conscience require restitution of all benefits unjustly obtained by Defendants, including the return of misappropriated cryptocurrency and any proceeds derived therefrom.

111.   Defendants hold such assets in constructive trust for the benefit of Mr. DiPasquale and must disgorge all unjust enrichment obtained as a result of their conduct.

## COUNT SIX
### CIVIL CONSPIRACY - COMMON LAW
### AGAINST ALL DEFENDANTS

112.   Mr. DiPasquale realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

113.   Defendant @JamesBullzs and the Off-Ramp Defendants knowingly agreed and conspired with one another to commit unlawful acts,

including fraud, conversion, and related wrongful conduct, or to commit lawful acts by unlawful means.

114.    Each Defendant knew of the essential nature and scope of the conspiratorial plan and agreed, expressly or tacitly, to participate in and further the scheme by performing a specific role within a coordinated division of labor.

115.    In furtherance of the conspiracy, Defendants committed overt acts, including but not limited to:

    a. Making material misrepresentations to obtain cryptocurrency wallet credentials;

    b. Operating fraudulent technical support infrastructure;

    c. Receiving, laundering, off-ramping, pooling, and retaining fraud proceeds;

    d. Concealing the source and movement of misappropriated assets.

116.    Defendants' acts were interdependent and mutually reinforcing, and each Defendant benefitted from the conspiracy by receiving or controlling proceeds derived from the unlawful conduct.

117.    As a direct and proximate result of Defendants' conspiratorial conduct, Mr. DiPasquale suffered substantial damages, including the loss of cryptocurrency assets.

118.   Each Defendant is jointly and severally liable for all damages caused by the acts of any co-conspirator committed in furtherance of the conspiracy.

### COUNT SEVEN
### MONEY HAD & RECEIVED – COMMON LAW
### AGAINST ALL DEFENDANTS

119.   Mr. DiPasquale realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

120.   The Off-Ramp Defendants received money and/or cryptocurrency assets that belonged to Mr. DiPasquale and were wrongfully obtained through fraud and conversion.

121.   The assets received by the Off-Ramp Defendants were traceable to Mr. DiPasquale's transfers and were accepted with knowledge, or willful blindness, that the assets constituted proceeds of unlawful activity.

122.   The Off-Ramp Defendants retained, controlled, or used these assets for their own benefit or for the benefit of the fraudulent scheme.

123.   In equity and good conscience, the Defendants should not be permitted to retain Mr. DiPasquale's property, and restitution is required.

124.   Mr. DiPasquale is entitled to recover from Defendants the full amount of money and cryptocurrency had and received, together with interest and other equitable relief.

## X.    Relief Sought

125.    Mr. DiPasquale respectfully requests that the Court enter judgment in his favor and jointly and severally against Defendant @JamesBullzs and the Off-Ramp Defendants and grant the following relief:

### A.    Injunctive and Equitable Relief

126.    A temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendants, their agents, employees, co-conspirators, and all persons acting in concert with them from directly or indirectly:

    a.  Engaging in pig-butchering schemes or similar fraudulent conduct;

    b.  Soliciting or inducing cryptocurrency transfers through misrepresentation or deception;

    c.  Transferring, dissipating, concealing, converting, or otherwise disposing of assets traceable to the scheme.

    d.  An order freezing all cryptocurrency, fiat currency, accounts, wallets, exchange accounts, and other assets owned by, controlled by, or traceable to Defendants that are derived from or connected to the fraudulent scheme.

    e.  An order authorizing expedited discovery, including but not limited to subpoenas directed to cryptocurrency exchanges, custodial service providers, financial institutions, and other third parties, for the purpose of

identifying, tracing, and preserving assets and identifying additional participants in the scheme.

f. An order requiring Defendants to provide a full accounting of all cryptocurrency, fiat currency, wallets, exchange accounts, and other assets received, transferred, converted, or controlled in connection with the scheme.

g. An order imposing a constructive trust over all cryptocurrency, fiat currency, exchange accounts, wallets, and other assets that are traceable to the fraudulent scheme, including assets held by Defendants or by third parties for Defendants' benefit.

h. An order directing any cryptocurrency exchange, custodial service, or financial institution holding assets subject to the constructive trust to preserve such assets and, upon further order of the Court, to transfer or release such assets to Mr. DiPasquale.

## B. RICO Remedies (18 U.S.C. § 1964)

127. Treble damages pursuant to 18 U.S.C. § 1964(c) for injuries sustained by Mr. DiPasquale as a result of Defendants' violations of 18 U.S.C. §§ 1962(c) and (d).

128. An order disgorging all ill-gotten gains obtained by Defendants as a result of the racketeering activity.

129. An order imposing a constructive trust over all assets traceable to the racketeering enterprise.

130. An award of costs, expenses, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### C.    Compensatory and Restitutionary Relief

131. Compensatory damages in an amount to be proven at trial for all losses suffered by Mr. DiPasquale, including but not limited to the value of misappropriated cryptocurrency and related financial harm.

132. Restitution of all cryptocurrency and other assets wrongfully taken from Mr. DiPasquale.

133. Pre-judgment and post-judgment interest as permitted by law.

### D.    Declaratory Relief

134. A declaration that Defendants' conduct violated federal RICO statutes and common law governing fraud and conversion.

135. A declaration that Mr. DiPasquale is entitled to recover assets traceable to the fraudulent scheme from Defendants and any third parties holding such assets for Defendants' benefit.

136. A declaration that Defendants possess no lawful ownership interest in assets traceable to the scheme and that such assets are held in equity for Mr. DiPasquale.

### E.    Additional Relief

137. An order appointing a receiver or special master, if necessary, to identify, marshal, manage, and preserve assets subject to this action.

- 35 -

138.   Such other and further relief as the Court deems just and proper.

## XI.   Jury Demand

139.   Mr. DiPasquale demands a trial by jury on all claims so triable.

Dated:  April 9, 2026                    Respectfully submitted,

                                         CYBERJUSTICE LAW GROUP


                                         Marshal J. Hoda, Esq.
                                         Tx. Bar No. 2411009
                                         3120 Southwest Fwy
                                         Ste. 101 PMB 51811
                                         Houston, TX 77098
                                         o. (832) 838-0036
                                         marshal@cyberjustice.law

                                         *Attorney for Plaintiff*